[No. S164174. May 17, 2010.]

SIMPSON STRONG-TIE COMPANY, INC., Plaintiff and Appellant, v. PIERCE GORE et al., Defendants and Respondents.

14

COUNSEL

Shartsis Friese, Arthur J. Shartsis, Erick C. Howard; Eisenberg and Hancock, Jon B. Eisenberg and William N. Hancock for Plaintiff and Appellant.

Davis Wright Tremaine, Thomas R. Burke and Rochelle L. Wilcox for Defendants and Respondents.

Arkin & Glovsky and Sharon Arkin for Consumer Attorneys of California as Amicus Curiae on behalf of Defendants and Respondents.

Levy, Ram & Olson and Karl Olson for Senator Sheila Kuehl and California First Amendment Coalition as Amici Curiae on behalf of Defendants and Respondents.

OPINION

BAXTER, J.—In this case we consider the scope of the commercial speech exemption to the anti-SLAPP statute. (See Code Civ. Proc., §§ 425.16, 425.17, subd. (c).)[1]

In February 2006, plaintiff Simpson Strong-Tie Company, Inc. (Simpson), filed this action for defamation and related claims against defendants Pierce Gore and The Gore Law Firm arising from a newspaper advertisement placed by Gore a few weeks earlier. The advertisement, which was directed to owners of wood decks constructed after January 1, 2004, advised readers that "you may have certain legal rights and be entitled to monetary compensation, and repair or replacement of your deck" if the deck was built with galvanized screws manufactured by Simpson or other specified entities, and invited those persons to contact Gore "if you would like an attorney to investigate whether you have a potential claim."

---

[1] SLAPP is an acronym for "strategic lawsuit against public participation." (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1 [3 Cal.Rptr.3d 636, 74 P.3d 737].) All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

Gore moved successfully in the superior court to have the entire complaint stricken under section 425.16, the anti-SLAPP statute, and the Court of Appeal affirmed. We granted review to consider the limited issue whether Simpson's complaint was exempt from the anti-SLAPP statute because of section 425.17, subdivision (c) (section 425.17(c)), which excludes causes of action arising from representations of fact about the speaker's or a competitor's "business operations, goods, or services . . . made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services" or "made in the course of delivering the person's goods or services." Having found that the complaint is not exempt from dismissal under the anti-SLAPP statute, we affirm.

## Background

Plaintiff Simpson is a California corporation in the business of designing, manufacturing, and marketing building products, including metal connectors and other hardware for use in wood frame construction. According to Simpson, it is well known in the wood frame construction industry that pressure-treated wood, which is commonly used in outdoor decks to protect against termites and fungal decay, can have a corrosive effect on steel products, including galvanized screws. Corrosion potentially shortens the service life of these fasteners and connectors and compromises their ability to support their recommended loads or endure seismic and environmental stresses.

In early 2004, at the recommendation of the United States Environmental Protection Agency, the construction industry stopped selling lumber treated with chromium copper arsenate, due to health hazards posed by its arsenic content. Alternative lumber products, such as wood treated with alkaline copper quaternary and copper azole, were substituted, but, as Simpson explains, these chemicals are "more corrosive" to galvanized steel products. Simpson states that it communicated this potential problem to the building industry and to the public generally through its Web site, annual catalog, articles in engineering and building magazines, bulletins issued to the building industry, point-of-sale information, and annual report.

Gore, a California attorney, learned from television reports about the potential for corrosion of galvanized deck fasteners and connectors when used on wood pressure treated with alkaline copper quaternary or copper azole, and contacted Ted Todd, a senior inspector with the Contra Costa

County District Attorney's Office who was featured in the television reports. At that time, the district attorney's office was conducting an investigation into the risk posed by galvanized fasteners and connectors when used with these types of pressure-treated wood. The office ultimately issued a "Consumer Alert" warning of the corrosive effect of the new pressure-treated wood products "on the metal connector brackets typically used in construction." The alert noted that advisories had been posted in some retail stores about the potential incompatibility of the two products but cautioned that the advisories "tend to be in very small print or somewhat inconspicuously posted."

Gore also visited the company Web site, where Simpson had advised in bold type that "[m]any of the new Pressure Treated Woods use chemicals that are corrosive to steel. By selecting connectors that offer greater corrosion resistance . . . you can extend the service life of your connectors. However, corrosion will still occur. You should perform periodic inspection of your connectors and fasteners to insure their strength is not being adversely affected by corrosion. In some cases, it may be necessary to have a local professional perform the inspections. Because of the many variables involved, Simpson Strong-Tie cannot provide estimates on service life of connectors, anchors or fasteners."

In addition, Gore discovered that a class action complaint had been filed in Massachusetts against one of Simpson's competitors, Phillips Fastener Products, Inc., which sought relief on behalf of consumers allegedly damaged by defective galvanized fasteners and connectors used with pressure-treated lumber, and that Gore's former law firm, Lieff, Cabraser, Heimann & Bernstein, LLP, was investigating claims that some of the newly designed fasteners were failing, in spite of the manufacturers' representations that the "special coatings" were intended to resist corrosion.

Based on this information, Gore arranged for an advertisement to be placed in the San Jose Mercury News in order to locate individuals who had purchased galvanized fasteners and connectors manufactured by Simpson and two other companies, which together were responsible for most of the metal fasteners sold to consumers in California. The advertisement, which commenced Christmas Day 2005 and ran four more times over a 28-day period in the Mercury News and once in the Los Gatos Weekly-Times, read as follows:

---

**ATTENTION:**

# WOOD DECK OWNERS

If your deck was built after January 1, 2004 with galvanized screws manufactured by Phillips Fastener Products, Simpson Strong-Tie or Grip-Rite, you may have certain legal rights and be entitled to monetary compensation, and repair or replacement of your deck.

Please call if you would like an attorney to investigate whether you have a potential claim:

Pierce Gore
**GORE LAW FIRM**
900 East Hamilton Ave.
Suite 100 Campbell, CA 95008
408-879-7444

---

Gore has asserted that the wording of the advertisement was modeled after notices he or his cocounsel had used in this state and in others during the preceding three years in connection with potential class actions based on consumer fraud or product defects.

In a letter dated January 9, 2006, counsel for Simpson advised Gore that the advertisement falsely implied that Simpson's galvanized screws fail to meet appropriate industry standards and that a valid claim may exist against Simpson based upon negligence or product liability. The letter demanded that Gore cease publication of any further defamatory advertisements directed at Simpson and reserved Simpson's right to recover against Gore for any costs or damages that may have already resulted from this or any similar publication. Gore did not respond to the letter. In a letter dated January 27, 2006, counsel for Simpson declared that Gore's failure to respond "suggests that your claims are without merit, and that your newspaper advertisement is false, misleading, and defames Simpson. . . . Unless you can present specific evidence to support your charges, Simpson intends to pursue its defamation claim against your firm[] and vindicate its rights." Again, Gore did not respond.

Prior to filing this action, Simpson retained an opinion survey firm to confirm that the advertisement had caused injury to Simpson's reputation. The survey firm intercepted 214 randomly selected shoppers at nine different

home improvement stores in January and February 2006 and obtained their responses to a set of questions with and without exposure to the Gore advertisement. The survey revealed that the shoppers, after reading the advertisement, were significantly more likely to believe that Simpson's galvanized screws were defective or of low quality and were significantly less likely to purchase galvanized screws manufactured by Simpson.

Two days after the survey was completed, Simpson filed this action for defamation, trade libel, false advertising, and unfair business practices. The complaint sought compensatory and punitive damages as well as injunctive relief.

When Gore moved to strike the complaint under section 425.16, Simpson invoked the exemption to the anti-SLAPP law for commercial speech under section 425.17(c). The trial court granted the special motion to strike and entered a judgment of dismissal, finding Gore had made a threshold showing that the statements were made in furtherance of his right of petition or free speech on an issue of public interest (§ 425.16, subd. (e)(4)), that Simpson had failed to demonstrate a probability of prevailing on the merits (§ 425.16, subd. (b)(1)), and that the commercial speech exemption did not apply because the advertisement made no statement about a business competitor's products or services.

The Court of Appeal affirmed in a published opinion. The court first considered "who bears the burden of persuasion with respect to the applicability of [the section 425.17(c)] exemption—the party invoking the anti-SLAPP law (i.e., the defendant), or the party invoking the exemption (the plaintiff)?" In assigning the burden to plaintiff, the Court of Appeal disagreed with *Brill Media Co., LLC v. TCW Group, Inc.* (2005) 132 Cal.App.4th 324 [33 Cal.Rptr.3d 371] (*Brill*), which had assigned the burden to the defendant to establish that the cause of action is *not* exempt. The court next determined that while the advertisement was "made for the purpose of . . . promoting . . . [Gore's] services" (§ 425.17(c)(1)), Simpson's causes of action did not " 'aris[e] from' " any representation of fact " 'about' Gore's or a competitor's services or business operations."

In construing the exemption in section 425.17(c)(1) for causes of action arising from statements or conduct "made in the course of delivering the person's goods or services," the Court of Appeal once again disagreed with *Brill*, which had found this prong was satisfied where the "statements were made and conduct engaged in as part of . . . the type of business transaction engaged in by defendants." (*Brill, supra,* 132 Cal.App.4th at p. 341.) The Court of Appeal reasoned that the Legislature had enacted instead "a much narrower exemption, predicated by its plain terms on conduct in the course of

*delivering* the *goods or services* the defendant is in the business of *selling or leasing.*" The court then found that the advertisement here "was *seeking business from* prospective clients, not *delivering services to* them." Concluding that the anti-SLAPP statute applied and that Simpson had failed to establish a probability of prevailing on any of its claims, the Court of Appeal affirmed the order granting the special motion to strike and the judgment of dismissal.

We granted review to address the conflict in the case law concerning the construction of the commercial speech exemption to the anti-SLAPP statute.

### DISCUSSION

■ A SLAPP is a civil lawsuit that is aimed at preventing citizens from exercising their political rights or punishing those who have done so. " 'While SLAPP suits masquerade as ordinary lawsuits such as defamation and interference with prospective economic advantage, they are generally meritless suits brought primarily to chill the exercise of free speech or petition rights by the threat of severe economic sanctions against the defendant, and not to vindicate a legally cognizable right.' " (*Castillo v. Pacheco* (2007) 150 Cal.App.4th 242, 249–250 [58 Cal.Rptr.3d 305], quoting Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1296 (1997–1998 Reg. Sess.) as amended May 12, 1997, pp. 1–2.)

In 1992, out of concern over "a disturbing increase" in these types of lawsuits, the Legislature enacted section 425.16, the anti-SLAPP statute. (§ 425.16, subd. (a).) The statute authorized the filing of a special motion to strike to expedite the early dismissal of these unmeritorious claims. (§ 425.16, subds. (b)(1), (f).) To encourage "continued participation in matters of public significance" and to ensure "that this participation should not be chilled through abuse of the judicial process," the Legislature expressly provided that the anti-SLAPP statute "shall be construed broadly." (§ 425.16, subd. (a).)

■ A special motion to strike involves a two-step process. First, the defendant must make a prima facie showing that the plaintiff's "cause of action . . . aris[es] from" an act by the defendant "in furtherance of the [defendant's] right of petition or free speech . . . in connection with a public issue."[2] (§ 425.16, subd. (b)(1).) If a defendant meets this threshold showing, the cause of action shall be stricken unless the plaintiff can establish "a probability that the plaintiff will prevail on the claim." (*Ibid.*)

In 2003, concerned about the "disturbing abuse" of the anti-SLAPP statute, the Legislature enacted section 425.17 to exempt certain actions from it.

---

[2] See *Leoni v. State Bar* (1985) 39 Cal.3d 609, 624 [217 Cal.Rptr. 423, 704 P.2d 183] (lawyer advertising is protected by the 1st Amend.).

(§ 425.17, subd. (a).) We recently discussed the exemption for public interest lawsuits in *Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309 [86 Cal.Rptr.3d 288, 196 P.3d 1094], where we "narrowly construed" section 425.17, subdivision (b) and held that it applied "only when the entire action is brought in the public interest." (*Club Members for an Honest Election, supra*, 45 Cal.4th at pp. 316, 312.)

This case involves the scope and operation of the exemption for commercial speech under section 425.17(c), which provides: "Section 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services, including, but not limited to, insurance, securities, or financial instruments, arising from any statement or conduct by that person if both of the following conditions exist: [¶] (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services. [¶] (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer . . . ."

■ The commercial speech exemption, like the public interest exemption, "is a statutory exception to section 425.16" and "should be narrowly construed." (*Club Members for an Honest Election v. Sierra Club, supra*, 45 Cal.4th at p. 316; see also *Major v. Silna* (2005) 134 Cal.App.4th 1485, 1494 [36 Cal.Rptr.3d 875]; accord, Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, pp. 7–8 ["before us for consideration in [Senate Bill No.] 515 is a measure that seeks to trim off a few bad branches as argued and identified by the [Consumer Attorneys of California]"].)

> A. *Which Party Bears the Burden to Establish the Applicability of the "Commercial Speech" Exemption Under Section 425.17(c)?*

The Court of Appeal determined that Simpson, as the plaintiff, bore the burden of establishing that Gore's advertisement fell within the commercial speech exemption to the anti-SLAPP law, relying on the general rule that " '[o]ne claiming an exemption from a general statute has the burden of proving that he comes within the exemption.' " Simpson argues that the burden should have been placed on Gore, as the defendant, to establish that the exemption does *not* apply. He relies in particular on our summary in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685] (*Equilon*), of the "two-step process" for

analyzing anti-SLAPP motions: "First, the court decides whether the *defendant* has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the *plaintiff* has demonstrated a probability of prevailing on the claim." (Italics added.) We agree with the Court of Appeal's construction.

It is a "familiar" and "longstanding" legal principle that " '[w]hen a proviso . . . carves an exception out of the body of a statute or contract those who set up such exception must prove it.' " (*Meacham v. Knolls Atomic Power Laboratory* (2008) 554 U.S. 84, 91 [171 L.Ed.2d 283, 128 S.Ct. 2395, 2400]; see also *Trade Comm'n v. Morton Salt Co.* (1948) 334 U.S. 37, 44–45 [92 L.Ed. 1196, 68 S.Ct. 822] ["the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits . . ."]; accord, 29 Am.Jur.2d (2008) Evidence § 176, p. 193.) Likewise, in California, "it has been declared that where the statute has exemptions, exceptions or matters which will avoid the statute the burden is on the claimant to show that he falls within that category." (*Colonial Ins. Co. v. Ind. Acc. Com.* (1945) 27 Cal.2d 437, 441 [164 P.2d 490]; see also *Briggs v. McCullough* (1869) 36 Cal. 542, 551–552; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1345 [63 Cal.Rptr.2d 562] ["one who claims an exemption from a general statute has the burden of proving that he or she comes within the exemption"].)

Simpson does not dispute that section 425.16 sets forth a general statute or that section 425.17 creates specified exemptions to it. Simpson contends, though, that the familiar and long-standing rule of statutory construction governing exemptions to a general statute was abrogated by the enactment in 1965 of Evidence Code section 500, which provides: "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting."

Although it is true that Evidence Code section 500 superseded former section 1981, which had provided that the burden of proof was on the party holding the affirmative of the issue, the change in wording did not upset the traditional rule of statutory construction. As the Law Revision Commission Comments to Evidence Code section 500 explain, the phrase the " 'affirmative of the issue' " in former section 1981 had been criticized "as establishing a meaningless standard," inasmuch as " 'practically any proposition may be stated in either affirmative or negative form.' " (Cal. Law Revision Com. com., reprinted at 29B pt. 1 West's Ann. Evid. Code (1995 ed.) foll. § 500, p. 554.) Evidence Code section 500 was intended to make the allocation of the burden of proof "easier to ascertain" than the "classic formulation," but

not to signal a sea change in the law. (*Conservatorship of Hume* (2006) 140 Cal.App.4th 1385, 1388, fn. 5 [44 Cal.Rptr.3d 906]; see also *Los Angeles Unified School Dist. v. Workers' Comp. Appeals Bd.* (1984) 150 Cal.App.3d 823, 829 [198 Cal.Rptr. 116] [citing the two formulations together].) Tellingly, Simpson cites nothing to support its novel claim that Evidence Code section 500 abrogated the ordinary rule of statutory construction. (Cf. 31 Cal.Jur.3d (2002) Evidence, § 90, p. 151 ["What facts are essential to a particular party's claim for relief or defense is generally a matter to be determined by the substantive law, not the law of evidence; Evid. Code, § 500 does not purport to determine which facts are 'essential' to the plaintiff's claim for relief and which facts are 'essential' to a claimed defense, but rather leaves those substantive determinations to be resolved in light of the particular cause of action or defense at issue." (fns. omitted)].) Indeed, the Law Revision Commission comments note that Evidence Code section 500 "follows th[e] basic rule"—i.e., " 'that whatever facts a party must affirmatively plead he also has the burden of proving' "—and is even broader, in that it "appl[ies] to issues not necessarily raised in the pleadings." (Cal. Law Revision Com. com., reprinted at 29B pt. 1 West's Ann. Evid. Code, *supra*, foll. § 500, p. 554.) Inasmuch as Simpson concedes that "[t]he initial burden should be on the plaintiff to invoke the exemption in opposition to the anti-SLAPP motion," it follows that the plaintiff also has the burden of proving the applicability of the exemption.

Furthermore, the "general principle" of Evidence Code section 500 is "that a party who seeks a court's action in his favor bears the burden of persuasion thereon." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Because establishing the commercial speech exemption is essential to Simpson's defense to the special motion to strike, Evidence Code section 500 places the burden of proof on Simpson. (See generally *City of Lafayette v. East Bay Mun. Utility Dist.* (1993) 16 Cal.App.4th 1005, 1017 [20 Cal.Rptr.2d 658] [" ' "One seeking to be excluded from the sweep of the general statute must establish that the exception applies." ' "].)

Nothing in *Equilon* or its discussion of the "two-step process" alters the analysis. (*Equilon, supra,* 29 Cal.4th at p. 67.) In *Equilon,* we explained that the defendant has the burden to show that the cause of action being challenged under the anti-SLAPP statute is one arising from protected activity. (*Equilon, supra,* at p. 67.) In discussing the defendant's burden at the first stage, *Equilon* construed only section 425.16, and did not purport to identify the party with the burden to establish the existence or nonexistence of the public interest exemption in section 425.17, subdivision (b), or the commercial speech exemption in section 425.17(c), inasmuch as *Equilon* predated the enactment of section 425.17. It is worth noting, though, that

nothing in *Equilon* purported to abrogate the long-standing rule of construction that the party seeking to benefit from an exception to a general statute bears the burden to establish the exception.[3]

 Simpson argues, correctly, that the ordinary rules governing allocation of the burden of proof may be disregarded for policy reasons in exceptional circumstances. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 119–120 [284 Cal.Rptr. 318, 813 P.2d 1348]; *Cassady v. Morgan, Lewis & Bockius LLP* (2006) 145 Cal.App.4th 220, 234 [51 Cal.Rptr.3d 527] (*Cassady*).) Yet such exceptions are "few, and narrow" (*Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1670 [3 Cal.Rptr.3d 279]), and the reasons justifying a shift in the normal allocation of the burden of proof must be "compelling" (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1193 [77 Cal.Rptr.2d 537, 959 P.2d 1213]; accord, *Meacham v. Knolls Atomic Power Laboratory*, *supra*, 554 U.S. at p. 91 [128 S.Ct. at p. 2400]). Simpson fails to identify any compelling justification.

Simpson does assert that the facts underlying the commercial speech exemption are "peculiarly" within the speaker's knowledge. But Simpson does not explain how a plaintiff would be significantly disadvantaged in demonstrating that the statement or conduct underlying its cause of action "consists of representations of fact about [the defendant]'s or a business competitor's business operations, goods, or services"; that the defendant's statement or conduct was "made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services" or "in the course of delivering the person's goods or services"; or that the "intended audience" was "an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer." (§ 425.17(c)(1), (2); see generally *Schaffer v. Weast* (2005) 546 U.S. 49, 60 [163 L.Ed.2d 387, 126 S.Ct. 528] [" 'Very often one must plead and prove matters as to which his adversary has superior access to the proof.' "].) In sum, Simpson does not persuade us that section 425.17(c) presents one of those " 'rare occasions' "

---

[3] As Simpson points out, *Brill* did place the burden on the defendant. But *Brill* analyzed only whether the applicability of the commercial speech exception was part of *Equilon*'s first step, where the court decides whether the defendant has made a threshold showing the challenged cause of action arises from protected activity, or part of *Equilon*'s second step, where the court determines whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Brill*, *supra*, 132 Cal.App.4th at pp. 329–331.) *Brill*'s conclusion that the defendant had the burden of proof to establish the nonapplicability of the commercial speech exception was based solely on its classification of the issue as a first-step determination and did not at all consider section 425.17's status as an exception to section 425.16 or any canons of construction. (*Brill*, *supra*, at p. 331.) *Brill Media Co., LLC v. TCW Group, Inc.*, *supra*, 132 Cal.App.4th 324, is therefore disapproved to the extent it is inconsistent with our holding here.

justifying a deviation from the normal allocation of the burden of proof. (*Cassady*, *supra*, 145 Cal.App.4th at p. 234.)

■ The burden of proof as to the applicability of the commercial speech exemption, therefore, falls on the party seeking the benefit of it—i.e., the plaintiff.

### B. *Were Simpson's Causes of Action Exempted from the Anti-SLAPP Statute by Section 425.17(c)?*

As noted, section 425.17(c) provides, in pertinent part: "Section 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services . . . arising from any statement or conduct by that person if both of the following conditions exist: [¶] (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services. [¶] (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual buyer or customer . . . ."

There are no disputed issues of fact here. We review the applicability of the commercial speech exemption independently. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 [46 Cal.Rptr.3d 638, 139 P.3d 30].)

The Court of Appeal held, and the parties' initial briefing assumed, that section 425.17(c)(1) prescribes a "content exemption" and a "delivery exemption" and that these exemptions have distinctly different elements. The content exemption shields a cause of action from the anti-SLAPP statute if the cause of action arises from a statement or conduct that "consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services." (§ 425.17(c)(1).) The delivery exemption provides a similar shield for *any* statement or conduct "made in the course of delivering the person's goods or services." (*Ibid.*) In other words, this approach divided the first 47 words of subdivision (c)(1) from the last 17 to create two independent and parallel theories of exemption from the anti-SLAPP law.

Although section 425.17(c)(1) is grammatically susceptible of such a construction, that construction was not necessarily the only plausible one.

Gore had observed, in a footnote in its initial briefing, that the statute might also be read to exempt a cause of action arising from a statement or conduct that consists of representations of fact about that person's or a competitor's business operations, goods, or services that was made *either* "for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services" *or* "in the course of delivering the person's goods or services." (§ 425.17(c)(1).) We granted the parties the opportunity to file supplemental briefing as to which construction was the correct one and, as will appear, agree with Gore's construction.

■ As in any case involving statutory interpretation, our fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose. (*People v. Lewis* (2008) 43 Cal.4th 415, 491 [75 Cal.Rptr.3d 588, 181 P.3d 947].) "We begin with the text of the statute as the best indicator of legislative intent" (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 844 [69 Cal.Rptr.3d 96, 172 P.3d 402]), but we may reject a literal construction that is contrary to the legislative intent apparent in the statute or that would lead to absurd results (*Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1105 [17 Cal.Rptr.2d 594, 847 P.2d 560]).

Simpson's argument, at least at the outset, relies on the plain language of section 425.17(c)(1) and the canon of construction of avoiding surplusage. According to Simpson, section 425.17(c)(1) creates two independent commercial speech exemptions, each introduced by the phrase "the statement or conduct," and to hold otherwise would render the second iteration of "the statement or conduct" in the subdivision redundant. In Simpson's view, therefore, the delivery exemption encompasses a cause of action arising from "*any* statement or conduct made in the course of delivering the person's goods or services." Gore argues that such a construction would contravene the legislative intent and lead to absurd results.

The Legislature's findings supporting the enactment of section 425.17 are set forth in subdivision (a), which states that "there has been a disturbing abuse of Section 425.16, the California Anti-SLAPP Law, which has undermined the exercise of the constitutional rights of freedom of speech and petition for the redress of grievances, contrary to the purpose and intent of Section 425.16. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process or Section 425.16."

The construction favored by Simpson does not effectively fulfill the statute's purposes. Under that construction, the Legislature can be seen to have carefully devised specific requirements in order to exempt a cause of

action under the content prong—i.e., the statement or conduct underlying the cause of action must (1) consist of representations of fact (2) about that person's or a business competitor's business operations, goods, or services, and (3) have been made for the purpose of obtaining approval for, promoting, or securing transactions in the person's goods or services. Yet, under Simpson's construction of the delivery prong, the Legislature apparently imposed no particular requirements—i.e., a cause of action arising from *any* statement or conduct on *any* subject for *any* purpose is exempted from the anti-SLAPP statute, as long as it was made in the course of delivering goods or services. Simpson has not offered any rationale for why the stage of the transaction should play such a critical factor in determining whether to exempt a cause of action from the reach of the anti-SLAPP law.

Moreover, under Simpson's approach, a business that was sued because of political or religious statements made by an employee *in the course of delivering* the product or service to a customer would be deprived of the protection of the anti-SLAPP law, but that same business would be able to invoke the anti-SLAPP law if the same statements were made for the purpose of obtaining approval for, promoting, or securing transactions in its products. Neither the Legislature's findings nor common sense endorses or justifies such a result.

Simpson effectively concedes that such a result would be problematic, but argues that the statements in these hypotheticals "are *not a part of* the delivery of goods or services" and thus fall outside the delivery exemption as Simpson would interpret it. But, as we recently observed, " '[d]uring' means 'at some point in the course of.' " (*People v. Lewis, supra,* 43 Cal.4th at p. 514.) Statements or conduct made *during* the delivery of goods or services thus would qualify as statements or conduct made *in the course of* delivering the goods or services. (Cf. § 425.17(c)(1).)

Simpson attempts to narrow the definition of the delivery exemption by combining language that appears in two different sentences in *Brill, supra,* 132 Cal.App.4th at page 341, to argue that the exemption extends only to " 'statements . . . made and conduct engaged in *as part of* . . . the type of business transaction engaged in by defendants.' " But this formulation does not appear anywhere in the text of section 425.17(c)(1). If, as Simpson effectively concedes, the delivery prong requires an interpretive gloss to avoid absurd results, it seems more consonant with legislative intent to adopt the restriction the Legislature articulated earlier in the sentence setting forth the exemption rather than to rummage about elsewhere for new limitations arising out of whole cloth.

Moreover, Simpson's construction of the delivery prong would render the first part of section 425.17(c)(1)—the so-called "content and purpose"

prong—surplusage. Statements or conduct that are " 'part of . . . the type of business transaction engaged in by defendants' " would necessarily encompass "representations of fact about that person's . . . business operations, goods, or services, that [are] made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services" (§ 425.17(c)(1)) inasmuch as *every* business engages in efforts to obtain approval for, promote, or secure sales or transactions in its goods or services. Indeed, Simpson concedes that "a grocer's advertisement in advance of intended sales" falls within its broad definition of the delivery prong "to the extent the advertising informs the public about the availability of the product for delivery" *or* "to the extent the advertising keeps the product in the public eye and bolsters its prestige." With such a broad definition of the delivery prong, there would be no need for the content and purpose prong.

The legislative history further undermines Simpson's interpretation of the statute. Summaries of the bill prepared for various legislative committees consistently stated that section 425.17(c) would prohibit "the anti-SLAPP motion from being used in specified causes of action against businesses sued for statements or conduct consisting of representations of fact about their goods, services or business operations, or those of a competitor, when *those* statements or conduct were for the purpose of obtaining approval for, promoting, or securing sales or leases of the person's goods or services, *or* in the course of delivering the person's goods or services, if the intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer . . . ." (Legis. Analyst, 3d reading analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended July 8, 2003, p. 1, italics added; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended June 27, 2003, p. 3, italics added; Assem. Republican Caucus, analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended June 27, 2003, p. 1, italics added; see also Sen. Sheila Kuehl, letter to Governor Gray Davis, Sept. 3, 2003, p. 2.) In addition, an analysis prepared for the Senate Committee on the Judiciary noted that Senate Bill No. 515 was "consistent with the recommendation of the Senate Judiciary Committee analysis last year on [Senate Bill No.] 1651[,] which urged the sponsors to look at *the content and context* of the statement or conduct when crafting an exemption, rather than enacting a wholesale exclusion of a class of defendants[,] which had been proposed in [Senate Bill No.] 1651." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515, *supra*, at p. 9, italics added.) Simpson offers no explanation why the Legislature would have been so concerned about the content of the statement or conduct in the first part of section 425.17(c)(1) but would have abandoned any such concern in the remainder of the sentence.

■ For these reasons, we interpret section 425.17(c) to exempt from the anti-SLAPP law a cause of action arising from commercial speech when (1) the cause of action is against a person primarily engaged in the business of selling or leasing goods or services; (2) the cause of action arises from a statement or conduct by that person consisting of representations of fact about that person's or a business competitor's business operations, goods, or services; (3) the statement or conduct was made either for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services or in the course of delivering the person's goods or services; and (4) the intended audience for the statement or conduct meets the definition set forth in section 425.17(c)(2).

Gore does not dispute that he is in the business of selling legal services, that Simpson's causes of action arise from Gore's advertisement, that the purpose of the advertisement was to promote Gore's legal services, or that the advertisement was addressed to a qualifying audience under section 425.17(c)(2). The point of contention concerns whether the causes of action "aris[e] from . . . [¶] . . . representations of fact about [Gore's] . . . business operations, goods, or services." (§ 425.17(c)(1).) We find that they do not.

■ Simpson's complaint asserts claims for defamation, trade libel, false advertising, and unfair business practices. The common theme among these causes of action is the allegation that the advertisement "communicates that Simpson's galvanized screws are defective." The complaint alleges in particular that the advertisement "is libelous on its face in that it falsely communicates to the reader that Simpson's products are defective"; that the advertisement "disparaged Simpson's goods in that the Advertisement falsely communicates to the reader that Simpson's galvanized screws are defective"; that these assertions in the advertisement "are false and misleading"; and that using "the false and misleading Advertisement to recruit potential plaintiffs to participate in an unjustified class action lawsuit against Simpson" was an unfair business practice.

We will assume arguendo that the advertisement implies that Simpson's galvanized screws are defective. As the Court of Appeal recognized, however, even an implication that Simpson's screws are defective "is not 'about' Gore's or a competitor's 'business operations, goods, or services . . . .'" (§ 425.17(c)(1).) It is, rather, a statement 'about' *Simpson*—or, more precisely, Simpson's products." It therefore falls squarely outside section 425.17(c)'s exemption for commercial speech.

Simpson contends that the advertisement does nonetheless satisfy the commercial speech exemption in that it "expressly states that 'an attorney' will 'investigate whether you have a potential claim'" and that it also

supports the inference "that Gore has investigated the named companies and has discovered that they are selling defective screws." Both of these statements are "about" Gore's business operations, but neither satisfies the elements of the commercial speech exemption to the anti-SLAPP law.

■ Simpson's causes of action plainly do not "arise from" (§ 425.17(c)) the representation that an attorney will investigate "whether you have a potential claim." Simpson's complaint does not allege that this statement is false or even that it is defamatory. In addition, a promise of what an attorney will do if the reader were to respond to the advertisement "is not a representation of fact, but an agreement to take certain actions in the future." (*Navarro v. IHOP Properties, Inc.* (2005) 134 Cal.App.4th 834, 841 [36 Cal.Rptr.3d 385].) Consequently, it does not constitute "representations of fact about that person's . . . business operations, goods, or services." (§ 425.17(c)(1).)

The alleged inference that Gore has investigated Simpson and discovered that the galvanized screws are defective is not obvious from the advertisement itself, which asserts only that users of these fasteners "may" have certain (but unspecified) legal rights and that an attorney would need to "investigate whether you have a potential claim." Even if one were to draw this inference, however, it would be no more than an attempt to layer the allegedly defamatory inference itself—i.e., that Simpson's galvanized screws are defective—with an alleged inference that Gore had *discovered* the defect. Simpson cites no authority for expanding the scope of the commercial speech exemption in this manner. (Cf. *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 676 [105 Cal.Rptr.3d 98] [the commercial speech exemption did not apply to a claim that the defendant magazine wrongfully used plaintiffs' names for a Camel advertisement; "as plaintiffs concede, the goods they sell are copies of Rolling Stone magazine, not Camel cigarettes. More significantly, the statement or conduct at issue here did not consist of 'representations of fact about the business operations, goods or services' of Rolling Stone or of any of defendants' business competitors. Instead, the representation at the center of this lawsuit is the representation that plaintiffs and their fellow musicians endorse the sale and use of Camel cigarettes."]; accord, *New.Net v. Lavasoft* (C.D.Cal. 2004) 356 F.Supp.2d 1090, 1104 [the commercial speech exemption did not apply because "the purportedly offending statements are not statements made about Defendant's product, but rather statements about Plaintiff and its products" and the two were not competitors]; see also *Troy Group, Inc. v. Tilson* (C.D.Cal. 2005) 364 F.Supp.2d 1149, 1151, 1155 [defendant investment adviser's e-mail asking whether plaintiff corporation is one of "the biggest crooks on the planet or what?" is "clearly not about [the defendant]'s business, rather it is about [the plaintiff], which, as [the plaintiffs] admit, is not a business competitor of [the defendant]"].) We are reluctant to allow plaintiffs to evade the limitations of the statutory

text by mere wordplay, especially given our obligation to construe the commercial speech exemption narrowly.

Moreover, Simpson has not attempted to recover damages here because of any implied representation that Gore allegedly *discovered* that Simpson's products were defective, but because Gore allegedly *implied* that they were defective. Whether the Simpson products are in fact defective is beyond the scope of this proceeding, but the inference that they are defective is not a representation of fact about *Gore's* business operations, goods, or services. The Court of Appeal stated the issue succinctly: "To the extent that Gore's advertisement 'consists of' representations about his services, Simpson's action does not 'aris[e] from' it; to the extent that Simpson's action 'aris[es] from' a representation by Gore, the representation was not 'about' Gore's or a competitor's services or business operations."[4]

Simpson argues next that the commercial speech exemption from dismissal under the anti-SLAPP statute should not require that the statement itself giving rise to the cause of action include factual representations about the defendant's or a business competitor's business operations, goods, or services, as long as the statement giving rise to the cause of action is *accompanied* by factual representations about the defendant's or a business competitor's business operations, goods, or services. The statute's plain language, however, is otherwise. The commercial speech exemption applies only to a cause of action "arising from" a statement (or conduct) that "consists of representations of fact about that person's or a business competitor's business operations, goods, or services . . . ." (§ 425.17(c)(1).)

 Simpson complains, with rhetorical flourish, that the advertisement "defam[es] Simpson in order to tout Gore and his services. . . . The tout and the defamation were of an inseparable whole, with the defamation serving as bait for the tout. The Court of Appeal's approach is as if to parse cheese from a mousetrap." But this is merely another way of saying that the speaker made a representation of fact about a *noncompetitor's* goods for the purpose of promoting the speaker's own services. Had the Legislature intended the commercial speech exemption to encompass representations of fact about *any* business operations, goods, or services made for the purpose of promoting sales, leases, or transactions in the speaker's own goods or services, then it would not have limited the exemption to statements or conduct consisting of "representations of fact about *that person's or a business competitor's* business operations, goods, or services . . . ." (§ 425.17(c)(1); see *Mendoza v.*

---

[4] One can conceive of a cause of action arising from a representation of fact about the attorney's own services—such as a false claim that the attorney had already recovered a judgment against the manufacturer for the defective product—but the advertisement in this case did not contain such a representation.

*ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1652 [107 Cal.Rptr.3d 294] ["the Legislature appears to have enacted section 425.17, subdivision (c), for the purpose of exempting from the reach of the anti-SLAPP statute cases involving comparative advertising by businesses."].)

The legislative history accords with the statute's plain language. As stated earlier, committee reports summarized the bill as "[p]rohibit[ing] the anti-SLAPP motion from being used in specified causes of action against businesses sued for statements or conduct *consisting of* representations of fact about their goods, services or business operations, or those of a competitor, *when those statements* . . . were for the purpose of obtaining approval for, promoting, or securing sales or leases of the person's goods or services, or in the course of delivering the person's goods or services . . . ." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 515, *supra*, at p. 3, italics added.) The plain language and the legislative history each confirm that the statement or conduct giving rise to the cause of action must consist of factual representations about the speaker's (or a competitor's) goods, services, or business operations. Nothing in the plain language or the legislative history suggests it would be enough to protect against dismissal under the anti-SLAPP statute if the factual representations about the speaker's or a competitor's business simply appeared in the same publication as the statements actually giving rise to the cause of action.[5]

Indeed, Simpson's proposed construction would seriously undermine the anti-SLAPP statute itself. As Gore points out, a press release critical of a political candidate—i.e., core political speech—would lose the protection of the anti-SLAPP statute if the press release *also* mentioned the products sold by the business. We therefore reject Simpson's expansive construction of the commercial speech exemption and conclude, in accordance with the trial court and the Court of Appeal, that Simpson's complaint was not exempted from the anti-SLAPP statute by section 425.17(c)(1).

The trial court went on to consider Gore's special motion to strike the complaint under section 425.16, determined that Simpson had failed to establish a probability of prevailing on the merits, and granted the special motion to strike. The Court of Appeal affirmed. The correctness of those rulings is beyond the scope of our grant of review, which was limited to the

---

[5] Simpson complains that a party should not be able to defeat the commercial speech exception to the anti-SLAPP statute by parsing a two-sentence advertisement into its component parts. We agree. The proper test does not turn on the punctuation used in the advertisement, but on the basis for the cause of action. Here, the causes of action all arise from the inference that Simpson's products are defective, an inference that Simpson alleges is implied from the text of the advertisement. This inference, though, contains no representations of fact about *Gore's* business operations, goods, or services.

applicability of the commercial speech exemption to the anti-SLAPP statute set forth in section 425.17(c)(1).

## DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.